### Moore vs. Jackson, ex dem. Erwin and others.

Where two tracts of land were laid out in a parallelogram form, each being 8 miles long and 6 miles wide, containing together 67,438 acres, and distinguished as *townships* No. 3 and No. 4, and a deed was subsequently executed by the proprietor of those townships, conveying two tracts of land described as townships No. 3 and No. 4, "*to be six miles square, and containing 23,040 acres each and no more*," IT WAS HELD that the deed should be so construed as to carry into effect the manifest intention of the parties, that the township should be re-surveyed and a correction made of the

boundaries so as to reduce each township to six miles square and to the contents specified in the deed.

The grantees in such case, it was also *held*, had a right of election to locate their grant in any part of the two townships as surveyed at the date of the deed, the only restriction·upon them being to locate their grant in a square form.

After a lapse of 32 years, a release to a *cestui que trust* will be presumed against the heirs at law of a trustee.

Th e statute of limitations cannot be set up in bar to a recovery against the grand children of a person dying seised, against whom there was no adverse possession, where, at the decease of the grandfather, the mother of the lessors, through whom the estate descended to them, was under coverture, against whom the statute had not began to run, and the action is brought within ten years after the decease of their father the tenant by the curtesy.

ERROR from the supreme court. The action in the su-preme court was an action of ejectment for the recovery of land in the county of Steuben. The lessors of the plaintiff were the children and grand children of one *Arthur Erwin*, to whom and three others, Oliver Phelps, by deed bearing date the 17th September, 1790, conveyed two tracts of land described as "lying and being in the district of Erwin, in the county of Ontario, state of New-York, being *township num-ber three in the fifth range*, also *number four in the sixth range*, to be six miles square and containing 23,040 acres each and no more, and known by the name of the old Canisteo Castle." The townships described in the deed were a part of a large tract belonging to Oliver Phelps and Nathaniel Gorham, called *Phelps and Gorham's purchase* which was surveyed and laid out into townships in the year 1789. The premises in question lie within the lines of township number three, as originally surveyed; the south-east and the north-east corners of the township being trees marked as corners at the time of the survey, and the outlines of the township being distinctly marked in the original survey, on trees standing in lines corresponding with the corners of the township.

The deed to Erwin and his associates was taken by them for the benefit of themselves and eight other persons, be-tween whom an agreement in writing existed of the date of 18th October, 1789, relative to the purchase·of the lands. On the 23d August, 1790, one of those· eight persons ·con-

veyed his interest in the purchase to Erwin, who thus became entitled to *two-twelfths* of the land conveyed by Phelps.

On the trial of the cause, it was conceded that the rights of all the lessors of the plaintiff, except those who were the grand children of Erwin the original grantee, were barred by the statute of limitations. Those grand children were the children of a Mrs. *Mulhollon*, (a daughter of Erwin,) who was married to John Mulhollon in 1777, and died in 1809. Her husband survived her until 1815, when he also died. This suit was commenced in 1822. *Arthur Erwin*, the grand father of those lessors, died intestate in June, 1791, leaving 10 children, of whom Mrs. Mulhollon was one. She left eight children, seven of whom were lessors; so that if entitled to recover, the extent of the recovery would be $\frac{7}{8}$ of $\frac{1}{10}$ of $\frac{2}{12}$ of the premises in question demanded in this cause, being a farm containing 162 acres of land.

The defence set up to the recovery was, that such a construction should be given to the deed of the 17th September, 1790, as to limit the bounds of the townships to the quantity specified in the deed, viz. six miles square; and if so, the premises in question were not embraced in the grant, and the plaintiff was not entitled to recover. In support of this defence, it was shewn that in August, 1791, *Phelps*, the original proprietor, caused the two townships conveyed to Erwin and his associates to be surveyed, when it was ascertained that the townships, instead of being six miles square, were about 6 by 8 miles in extent; whereupon the surveyor run lines cutting off from the east side of township number *three* 12,099 acres, and from the north side of township number four 9,406 acres, which tracts thus run off from the townships were claimed by Phelps and Gorham, or by those to whom they had previously conveyed the lands comprised within the same. In December, 1793, the defendant purchased the premises in question of one *Williamson*, to whom the title of Phelps and Gorham had been transmitted. The *surviving* grantees of the deed of September, 1790, and all persons claiming under that title, acquiesced in the claim of Phelps and Gorham and the reduction of the bounds of the townships until the commencement of this suit.

In further support of the defence, it was shewn that on the 18th August, 1789, a *contract* was entered into between Oliver Phelps and two persons named Bennet and Brown, (acting for themselves and their associates,) for the sale and purchase of two tracts of land, by which Phelps covenanted that Bennet and Brown should have " two townships, each town to be six miles north and south, and five miles and one half east and west, lying in the county of Ontario, state of New-York, to be located in such a manner as to take in part or all of the old Canisteo Flat, and not to derange the adjacent towns." Subsequently a deed was executed to Erwin and three others of township No. 3, in the 5th range, and township No. 3, in the 6th range, but it being ascertained that those townships did not cover the *Canisteo Flats*, Phelps was applied to to execete a new deed, which he agreed to do provided the parties would consent to strike half a mile by six from each township, so as to make them five and a half by six miles. It was finally agreed that Phelps should convey township No 3, in the 5th range, and township No. 4, in the 6th range; but as considerable improvements had already been made on No. 3, instead of deducting *half* a mile from that township, it was agreed that a *whole* mile should be taken from No. 4, so as to leave No. 3 six miles square, and No. 4 five miles by six. In pursuance of this arrangement, the deed of the 17th September, 1790, was executed, and the grantees re-conveyed to Phelps one mile in width by six in length off of the west side of No. 4. Previous to this last conveyance, to wit, on the 18th October, 1789, a written agreement was entered into between Erwin and his co-grantees and the eight other persons, declaring that each one of the twelve associates was entitled to *one twelfth* of " two townships of land, each town being six miles north and south, and five miles and an half east and west, purchased of Oliver Phelps. Eight days after obtaining the deed of September, 1790, an agreement was entered into between *Erwin* and his associates, by which, for the consideration of £95, he agreed to survey twelve lots in the upper town, agreeable to a draft made for said town, " being six miles north and south, and five miles east and west," and also to survey twelve lots in

the lower town. In pursuance of this agreement, Erwin staked out the lots in No. 4, but did not close the lines. After his death, the other proprietors completed the survey of No. 4, dividing it into 12 lots of equal size, six miles long, lying north and south, and of the breadth of five miles in all, east and west. It further appeared, that about the latter part of August or beginning of September, 1790, *Erwin* told a witness, speaking of the size of the lower township, that it was to be six miles square ; if it exceeded that size, the surplus was to be given back to Phelps, and if it was too small, the full size was to be made up to them ; that *Jameson*, another proprietor, observed that he wished half a mile taken off of each township ; but Erwin said one mile had better be taken off of the west side of township No. 4, in the sixth range.

A verdict was taken for the plaintiff, subject to the opinion of the supreme court on a case made, with liberty to either party to turn the same into a special verdict or bill of exceptions. The supreme court gave judgment for the plaintiff ; (for the reasons of their judgment see 6 Cowen, 706, where also the case is stated more in detail ;) the defendant sued out a writ of error.

The cause was argued here by

*C. G. Troup & J. Tollmadge*, for the plaintiff in error, and by

*J. Platt*, for the defendant in error.

The following opinions were delivered :

By the CHANCELLOR. If the supreme court were right in their construction of the deed of the 17th of September, 1790, to Arthur Erwin and his associates, the children of Mrs. Mulhollon are entitled to one undivided sixtieth part of Moore's farm. As only seven of those children were the lessors of the plaintiff, the recovery was for but seven-eights of that sixtieth. The whole quantity of land to which they are entitled, out of this farm of 160 acres, is between two and three acres only. If this were the whole extent of the

ALBANY,
Dec. 1829.

Moore
v.
Jackson.

controversy, the case would be of little importance, as the peculiar phraseology of this deed, in connection with a similar state of facts, will not be likely again to occur. But the decision involves the title to the same proportion of every farm in a well settled tract of more than 20,000 acres of land, claimed under the same deed. Involving as it does the rights of a large population, it becomes our duty to examine that decision with great care and deliberation. While on the one hand we are careful not to let our sympathies in behalf of these settlers bias our judgments, so as to deprive the heirs of Mrs. Mulhollon of their legal rights; on the other hand we must be equally careful not to deprive a great number of the most useful class of citizens of any part of their hard earned possessions, unless the law of the land is clearly against them. It should also be borne in mind, that in the decision of this case we are not acting as a court of equity, but as a court of law. Our judgment must be founded upon legal principles alone, whatever remedy we may suppose these settlers entitled to in a different forum.

If the premises in question passed to the grantees under the deed of September, 1790, two twelfths thereof descended to the heirs of Erwin at his death. Before that deed was given, he had purchased the right of one of the associates; and he previously owned another twelfth of the lands contracted for, in his own right. He therefore took the legal estate as well as the equitable interest in that portion of the lands conveyed, as a tenant in common, and not as a joint tenant. Seven twelfths were, in fact, holden by the grantees in trust for their associates, although the deed was absolute on its face. Whether any part of the legal estate in those seven twelfths of the premises conveyed descended to the heirs of Arthur Erwin, it is not necessary now to inquire. If it did so, a release to the *cestuis que trust* would probably be presumed, after such a lapse of time. The decision of the court below on this point was unquestionably right.

I think there is as little doubt of the correctness of the decision of the supreme court on the statute of limitations. At the death of Erwin, in 1791, there was no adverse posses-

sion as to any of the lands claimed by the heirs of Mrs. Mul-
hollon. *One tenth of all his real estate descended to their
mother at that time.* She was then married, and continued
under coverture until her death in 1809. The time limited
by the statute never commenced running against her. The
husband was tenant by the curtesy initiate, at the death of
Erwin. The statute did not therefore begin to run against
her children until the death of their father, in 1815; and this
suit was commenced within ten years after his death.

The only question of difficulty in this case arises upon the
legal construction of the deed which was last given by Phelps
to the associates. The premises intended to be granted are
therein described as " two tracts or parcels of land lying and
being in the district of Erwin in the county of Ontario and
state of N. York, being township number *three* in the 5th range,
also number *four* in the 6th range, *to be six miles square*, and
containing 23,040 *acres each and no more*, and known by the
name of the old Canisteo Castle." Simultaneously with that
conveyance the grantees re-conveyed to Phelps a strip of
land one mile in width off of the west side of the last
mentioned township, describing the strip as one mile wide
and six miles in length. Before these conveyances were
made, the Phelps and Gorham purchase had been surveyed
and subdivided into ranges of townships, and the corners
thereof were marked and numbered on the land. If the
townships referred to and described in the deed had been six
miles square, they would have contained 23,040 acres each,
and no more. The words *and no more* would then have been
useless, and the participle *being* would naturally have oc-
cupied the present place of the verb to *to be*. That would have
corresponded with the ordinary mode of describing lands in
conveyances at that day. But when we ascertain, by look-
ing beyond the deed, that these townships, as then run out
and marked on the land, were six miles one way and some-
thing more than eight the other, and that the two together, in-
stead of containing 46,080 acres and no more, actually con-
tained 67,438 acres, it becomes necessary to enquire what
was the object of the grantor in inserting these unusual ex-
pressions in the deed.

The judge who delivered the opinion of the supreme court supposes the verb *to be* was, by mistake, inserted in this part of the description, instead of the participle *being;* and for the purpose of shewing how this mistake occurred, he refers to the original contract of purchase in August, 1789.

If the verb *to be* was copied from that contract by a mistake of the scrivener, the words of restriction which follow the number of acres are still left wholly unaccounted for, as nothing of that kind is contained in the contract. With deference I must insist that parol evidence cannot be received to contradict, add to, or vary the legal construction of a conveyance of land. (*Jackson* v. *Sill*, 11 Johns. R. 211.) If it appears upon the face of the deed that there is a mis-description or an imperfect designation of the subject of the grant, the intention of the grantor must, if possible, be carried into effect by construction of the conveyance; and in some cases the grantee may obtain the benefit of the grant by election. (1 Leon. Rep. 268. 1 Roll. 725.) If the objection does not appear upon the deed, but is produced by extrinsic evidence as to the situation of the subject matter of the grant, the conveyance must be construed in reference to the particular circumstances thus ascertained. Parol evidence may be received to aid a conveyance, and to prevent its becoming inoperative by reason of a latent ambiguity; but it is never allowed for the purpose of varying its legal construction by shewing a mistake.

If the lessors of the plaintiff were at liberty to resort to the original contract of purchase to show a mistake in the deed, the defendant had a similar right to resort to extrinsic and antecedent facts to shew the verb *to be* was understandingly and properly used to express the intention of the parties. If all the extrinsic facts found by the special verdict are to be considered legal evidence to ascertain the intention of the grantor, I think there can be no possible doubt in this case.

By the verdict it appears that in August, 1789, Phelps was the owner of a very large tract of land in the western part of this state, which was then a wilderness. His surveyors were then on the tract for the purpose of running this part of

it out into ranges and townships 5 miles by 6. The associates of Erwin entered into an agreement to send two of their number to make a location and purchase for the company. This committee selected a tract of land embracing the Canisteo flats or castle, as it was then called; and on the 18th of August, 1789, Phelps entered into a contract to sell them two townships, each town to be 6 miles north and south and 5½ miles east and west, to be located in such a manner as to take in part or all of the old Canisteo flat, and not to derange the adjacent towns. The committee reported these proceedings to their associates, and Erwin and another person were taken into the company, making twelve persons in all. The purchase was completed, and Phelps conveyed to Erwin and three others of the company the two townships, describing them by number and range, and calculating to include the Canisteo flats or castle within their bounds. It does not appear at what time this deed was given, but from the language of the agreement of the 18th of October, 1789, I infer it was previous to that time. If so, it must have been before the survey was completed; and the numbers of the townships were probably inserted in the deed with reference to their location agreeable to some map or plan of the tract. The survey was finished that year, and, by a mistake of the surveyors, the ranges of townships which were intended to be 6 miles by 5½ were generally made 6 miles square; and the two particular townships in respect to which this controversy arises, as they were actually run and marked on the land, were 6 miles by 8. Erwin and his associates afterwards ascertained that the townships described in their deed would not include the Canisteo flats or castle, and in September, 1791, they applied to Phelps to permit them to surrender up their old deed, and requested him to give them a new one for two townships in which the flats were situated. He agreed to give them a new deed, provided they would strike off half a mile from the side of each township, so as to make them of the size of 5½ miles by 6. As they had made considerable improvements in the lower township, they were unwilling to have less than six miles square in that town, but agreed that the whole mile should be deducted and taken

ALBANY,
Dec. 1829.

Moore
v.
Jackson.

from the west side of the upper town. This arrangement was sanctioned by Phelps, and the deeds of the 17th of September, 1790, were accordingly executed to carry the same into effect. It is also found by the special verdict that shortly before those deeds were executed, Erwin told one of his associates that the lower town was *to be* of the size of six miles square; that if it exceeded that size the surplus was to be given back to Phelps, and if it was too small, the full size was to be made up to them.

If the rights of the parties depended on these extrinsic facts, it is evident the lessors of the plaintiff have no equitable claim to any part of the land in the two gores which were cut off by the direction of Phelps in 1791. If these unusual expressions in the description of the property granted were inserted in reference to those facts, I think it is fairly to be presumed, from the language of the deed and those facts taken together, that the parties were aware some irregularities had occurred in locating these townships, and that they intended to provide for a re-survey and a correction of the boundaries, so as to make them just six miles square and no more.

If the whole of the extrinsic evidence is rejected, except that which relates to the actual location of the lots and the dimensions thereof at the time of the conveyance, which I think is the only legal way of construing the deed in this case, the result will be the same. The rule of law on this subject is that the deed should if possible be so expounded as to give effect to the intention of the parties. The construction must be made upon the whole instrument, and not upon any particular part thereof; and, if possible, such a construction should be given that every word in the deed may be operative. (*Jackson* v. *Beach*, 1 Johns. C. 399. *Jackson* v. *Myers*, 3 Johns. R. 388. *Jackson* v. *Blodget*, 16 id. 172. *Whallon* v. *Kauffman*, 19 id. 97.) If, at the date of this deed, the parties knew these townships were six miles by eight as then located on the land, the conveyance must be construed in the same manner as if that fact was inserted therein. In that case the conveyance would probably have read thus: " I, Oliver Phelps, &c. do grant, &c. two tracts of land lying

and being, &c. being township No. 3 in the 5th range, also No. 4 in the 6th range, *which townships are now 6 miles by 8, and containing together 67,438 acres of land,* but which townships are *to be* six miles square, containing 23,040 acres each, and no more. I think, therefore, that the literal as well as the legal construction of the deed was that the townships were to be altered so as to be but six miles square and to contain no more land than 23,040 acres in each, which, by computation, appears to be the precise quantity contained in a towhship of that size.

The supreme court inquire how the townships are to be located if these terms are retained by way of restriction. I confess I can see no difficulty in that respect which may not be easily overcome. If the reference to the old Canisteo Castle was not sufficient to shew from which end of the townships the excess was to be taken, the grantees probably had the right, at their election, to locate in any part of those two townships as then run out, provided they located in a square form, as prescribed in the conveyance. And after a lapse of more than thirty years, and the various acts of the associates and their representatives, I think it is fairly to be presumed they elected to locate the lands granted to them in that part of the two townships which remained after the gores were taken off. As the grant was entire, an election by a majority of the grantees must necessarily conclude their co-tenants in common. (Coke's Litt. 145, a. 1 Roll. 176, D.)

I think the numerous cases cited on the argument, as to misdescriptions of some particulars in deeds, when sufficient is therein contained to show what was intended to be granted, are not applicable to the special provisions of this conveyance. And the settled law, on the subject of a mistake in describing the quantity of land or the length of chain, when there are special calls for visible monuments or other specific locations in the deed, is not intended to be shaken by the conclusion to which I have arrived in this case.

I think the construction put upon the deed by the supreme court was erroneous, and that their judgment should be reversed.

By Mr. Senator S. ALLEN. The decision of the main question in this case depends upon a correct construction of the deed from Phelps to Erwin and his associates, in connection with the circumstances attending the purchase, division and occupation of the property.

ALBANY,
Dec. 1829.

Moore
v.
Jackson.

A deed should be expounded so as to give effect to the intent of the parties, and if a general clause be followed by special words which accord with the general clause, the deed should be construed according to the special matter. (*Culverhouse* v. *Beach* and *Munroe* v. *Allair*, 1 Johns. Dig. 497.) In Sheppard's Touchstone, 85, 6, the same principle in construing deeds is recognized, viz. that the construction be favorable, and as near to the minds and apparent intent of the parties as possible it may be ; for the words are not the principle thing in a deed, but the intent and design of the grantor.

It appears by the case, that on the 18th of August, 1789, Solomon Bennet and Elisha Brown entered into a written agreement with Oliver Phelps for two townships of land, " each town to be six miles north and south, and five miles and one half east and west, lying in the county of Ontario, state of New-York, to be located in such manner as to take in part or all of the old Canisteo flats, and not to derange the adjacent towns." Arthur Erwin and Uriah Stevens were let into the association after the aforesaid agreement was made, and the purchasers then consisted of twelve persons, who appointed Erwin, Bennet, Thomas and Stevens, four of the associates, to take a deed from Phelps for the lands. They accordingly obtained a deed of township No. 3 in the fifth range, and No. 3 in the sixth range. It was afterwards discovered, however, that the Canisteo flats were not covered by these townships, and the committee proposed to Phelps that he should take back the deed and give them another for No. 3 in the fifth range, and No. 4 in the sixth range. The townships they had previously bought were to be five and a half miles by six, and those they requested in exchange had been run out, or had been ordered to be run out 6 miles square. Phelps consented to give a new deed, as they requested, provided they would strike off from each township half a mile by six, so as to make them of the size

originally agreed upon ; but, as some improvements had been made in No. 3, they proposed, instead of taking half a mile from each, to re-convey to Phelps one mile from No. 4. Thus far the intention of the parties is plain ; Phelps was particular as to the quantity to be conveyed, and the others acquiesced.

On the 17th of September, 1790, Phelps conveys to "Erwin, Bennet, Thomas and Stephens, their heirs and assigns, two tracts or parcels of land, lying and being in the district of Erwin, in the county of Ontario, state of New-York, being township No. 3 in the fifth range, also township No. 4 in the sixth range, *to be six miles square, and containing twenty-three thousand and forty acres each, and no more,* and known by the name of the Old Canisteo castle." On the same day the committee execute a deed to Phelps for a piece of land, part of No. 4, to be one mile wide by six miles long, containing 3820 acres.

The court below seem to incline to the opinion that the words "to be" ought to have been written "being" six miles square ; but, if the after occurrences and acts of the parties are taken into consideration, it will appear, unless I am much deceived, that the words " to be" were properly adopted, and expressed the meaning and intention of the parties fully.

The whole country was then a wilderness, and it does not fully appear that the lots had then been surveyed, as the deed contains no reference whatever to marks or bounds ; but, if it be conceded that the tracts had been surveyed and the corners marked, as the court below seem to think they were, then the only reason which could have induced the grantor to omit a reference to them in the deed was, that he might have feared the lines were eroneously run, and as he did not intend to convey more than the exact number of acres designated, a reference to the marks were omitted.

Under this state of facts, it was quite natural for the grantor to use some particular mode of expression, in order that no dispute should arise as to the quantity sold, and the words he adopted are perhaps as suitable as any that could be employed for the purpose : " to be six miles square, and containing twenty-three thousand and forty acres each, and no

ALBANY.
Dec. 1829.

Moore
v.
Jackson.

more." The surveyors run out the lines of the greater part of the tract, but did not run out the boundary line of any one township, so as to test its contents with accuracy. This information, in all probability, was in the possession of Phelps, and may account for the particular and guarded expression in the deed, that the townships were to contain twenty-three thousand and forty acres each, and no more.

We are further informed, that after the lines had been run out, it was discovered that an error had been committed in running the old pre-emption line, and that the eastern boundary of the purchase, the point at which the surveyors were instructed to commence, was erroneously located; and, accordingly, the lines which they had run, left the townships sold to Erwin and his associates, six miles by eight, instead of six miles square, as they were intended to be.

This one fact, in my view, is sufficient to account for the cautious expression in the deed; for it cannot be supposed for a moment, when the association purchased townships to be six miles square, that they were, in consequence of an error in the survey so palpable as the one alluded to, to receive townships of six miles by eight miles.

The proprietors of these townships, as is shewn by the evidence, were perfectly aware of the error, and made no objection to its being rectified. It is stated that Stevens and Jameson, two of the proprietors, while going up the river Canisteo in company with Erwin, another proprietor, and conversing about the size of the lower town, that Erwin said it was to be six miles square, and if it exceeded that size, the surplus was to be given back to Phelps, and if too small, the full size was to be made up to them. This conversation took place in August, or September, 1790. The next summer the tracts were re-surveyed by Porter, and the gore run off; and in making this survey he was assisted by a number of the proprietors, who made no objection, but acquiesced in the proceeding. The line thus run has ever since been called and known in that part of the country as the gore line, and none of the possessions of the purchasers from Phelps ever extended beyond the line of the gore, except James Hadley, who had a possession within the gore before it was

ALBANY,
Dec. 1829.

Moore
v.
Jackson.

run off. When it was ascertained that Hadley was within the gore, however, the proprietors held a meeting and agreed to set off another lot to him in lieu of the one he then held, which was done.

Now, can it be supposed for a moment that Arthur Erwin, who while living was a leading man in this purchase, and was one of those who effected it, would make the observation he did, unless there had been a perfect understanding between him and Phelps on the subject, or that the other proprietors would have suffered this large tract of land to be taken from them, without opposition or remonstrance, if they had not perfectly understood the terms of the purchase? or that they would have quietly acquiesced in the expulsion of Hadley from the gore, and have agreed, at a pretty full meeting held for the purpose, to set off another lot within the purchase, in lieu of the one he then occupied, had it not been the decided opinion of the original purchasers that the act of running the gore line was just, and in accordance with the mutual understanding of the parties? The business accumulating in this court, it is supposed, would be sufficient to convince us that forbearance under such circumstances was not to be expected.

Arthur Erwin died in June, 1791, and his son Joseph became administrator of his estate. In the fall of this year, he and the other proprietors entered into an arrangement to make a division of the townships, and John Durham was employed as surveyor. He was directed to run off the tracts into 48 lots. He accordingly laid out No. 4 into twelve lots, the whole tract being 6 miles long and 5 broad; and while running No. 3, he was told by the proprietors that it was to be six miles square, and that his survey must be confined to that extent only.

It is in evidence, therefore, that Arthur Erwin, the ancestor of the defendants in error, admitted that the township was to be six miles square, and if it exceeded those dimensions, the surplus was to be returned, and the son who acted as the representative of the family, must have been acquainted with the fact, as he was a party to the agreement for the final survey and division of the property; and that all the proprietors

ALBANY,
Dec. 1829.

Moore
v.
Jackson.

were and are sensible of the fact is evident both by their own admissions and the circumstance that none of them have ever attempted to claim any part of the gore, or intimate that they had any interest in it.

William Stevens, a son of one of the original proprietors, has resided on No. 3 in the fifth range ever since 1790, and he, during all that time, never knew the proprietors of the townships, or any holding under them, except the defendants, to make a claim to the land in the gore, and the youngest of the Erwins has been of age since 1802, and no claim has been pretended by them until the commencement of the present suit.

Dugald Cameron states, that he has been a clerk in the land office of the Pulteney estate since 1795, and that the gore has always been considered as belonging to the estate, and the taxes on it have been regularly paid, and every other act of ownership exercised over the land to the present time.

It appears to me, therefore, if this deed is to be expounded so as to give effect to the intention of the parties, that the circumstances of the case are such as sufficiently to shew what that intention was ; that the grantor intended to sell townships of six miles square, and not six miles by eight, as they would be if the gore alluded to was included in the purchase, is clear to my mind ; and that this intention was well understood at the time the purchase was made by the associates, and has ever since been so understood and acted on by them and those who held under them.

The *general clause* of the deed alluded to in the citation from *Johnson* I take to be the conveyance " to Erwin, Bennet, Thomas and Stevens, their heirs and assigns, of two tracts of land lying and being in the district of Erwin, in the county of Ontario, state of New-York, being township No. 3 in the fifth range, and also No. 4 in the sixth range ;" and the *special* words I understand to be the following : " to be six miles square, and containing twenty three thousand and forty acres each, *and no more.*" There is no manner of discordance, therefore, between the general clause, which designates the land sold and where it lays, and the special

words, which define the size of the tracts and the number of acres they were to contain ; and the rule established by Chancellor Kent, in the quotation from Johnson, may be applied to the present case with peculiar propriety, and the deed be construed according to the special matter.

If a testator devises a specific quantity of land out of a larger tract, and describes the courses and distances to be run, and on running such courses the devise falls short of the quantity mentioned, it has been held that the *lines* intended to include the quantity devised, and the devisee will be entitled to have it run out at length. (2 Caines, 146.) If the intention is to govern in a case where the quantity falls short, upon the same principle it ought to govern where there is an excess.

Deeds should be so construed that the end and design of them should take effect agreeably to the intent of the parties, for although the judges have no power to alter the words of a deed, they may reject such as are insensible ; and where any deed or instrument is of doubtful or ambiguous construction, one of the best ways of explaining it is *by referring to the acts of the parties* to the deed or instrument. (1 Bridgman's Dig. 433, 434.)

If we take the words of the deed in their simple acceptation, therefore, and the intention, as shewn by the acts of the parties, it appears to me the conclusion is irresistible that the defendants in error have not a shadow of claim to the land in question, and therefore that the judgment of the court below ought to be reversed.

And this being the unanimous opinion of the court, the judgment of the supreme court was reversed accordingly.